956 A.2d 716

Nathaniel Paul McMILLAN

v.

STATE of Maryland.

No. 2453 Sept. Term, 2006.

Court of Special Appeals of Maryland.

Sept. 9, 2008.

300

302

Michael T. Morley of Washington, D.C. (Nancy Forster, Public Defender on the brief), of Baltimore, for appellant.

Sarah Page Pritzlaff (Douglas F. Gansler, Attorney General on the brief), Baltimore, for appellee.

Argued before HOLLANDER, WOODWARD, JAMES A. KENNEY, III, (retired, specially assigned), JJ.

HOLLANDER, J.

Following a trial in October 2006, a jury in the Circuit Court for Prince George's County convicted Nathaniel Paul McMillan, appellant, of the first-degree felony-murder of Hermann Haiss.[1] The victim was killed during a home invasion in November of 2005. Appellant, who was twenty years old at the time of trial, was sentenced to life imprisonment.

Appellant presents three questions on appeal, which we quote:

1. Did the trial court err in denying Mr. McMillan's request for an instruction concerning the affirmative defense of duress to the felony underlying the felony murder charge, despite Mr. McMillan's videotaped statement to police that he participated in the alleged

---

1. The jury returned verdicts of not guilty as to first-degree premeditated murder and second-degree murder. Appellant's brief misidentifies the victim as "Frank Hauss."

robbery by knocking on the victim's front door because he was afraid he otherwise would be killed?

2. Did the trial court lack jurisdiction to try Mr. McMillan for felony murder when he was indicted only for first-degree premeditated murder?

3. Did the trial court err by issuing a reasonable doubt instruction that the Maryland Court of Appeals and the Standing Committee on Pattern Criminal Jury Instructions had specifically rejected because judges and jurors throughout the state found it too confusing?

For the reasons that follow, we shall affirm.

## FACTUAL AND PROCEDURAL SUMMARY

On or about November 16, 2005, Hermann Haiss was bludgeoned to death with a baseball bat at his home on Cree Drive, in the Forest Heights neighborhood of Oxon Hill. The evidence at trial included testimony from police detectives, evidence technicians, an assistant medical examiner, and Haiss's son and daughter-in-law.

The victim's body was found on the floor of his garage by his daughter-in-law, Julie Haiss, on November 16, 2005. The front door of the house was ajar, and the safe that had held Haiss's collection of firearms was open and empty. According to the victim's son, Frank Haiss ("Frank"), who was familiar with the contents of his father's gun collection, the missing weapons included a .357 caliber pistol, three rifles, three shotguns, and two muzzle loading firearms. Frank stated that his father had purchased the gun safe and installed a security system for the home two years before the murder, because of an earlier burglary in which several firearms had been stolen.

Approximately twelve years before the murder, appellant's aunt and uncle had moved to the house next door to Haiss. Appellant had lived with his aunt and uncle for part of his childhood, and was a playmate of Haiss's grandchildren. According to Frank, appellant "absolutely" would have known that Haiss owned guns.

Appellant was arrested in connection with the murder on December 16, 2005. During a police interrogation, appellant gave a number of conflicting statements concerning the robbery and murder. Although appellant initially denied his involvement, he ultimately admitted that he knocked on Haiss's door, allowing two friends to gain entry to the victim's house. But, he denied that he entered Haiss's house or took part in the robbery and murder. The police interview was recorded on DVD, portions of which were played for the jury during the testimony of the detectives who conducted the interview.[2]

The first portion of the interview was conducted by Detective Thomas Hollowell. Detective Hollowell testified that he advised appellant of his *Miranda* rights, which appellant waived. Initially, appellant told Detective Hollowell that he had not recently been in his former neighborhood of Forest Heights. It then emerged that appellant had been "hanging out" with people from that neighborhood and that he had heard about the murder. Appellant told Detective Hollowell that he heard that an acquaintance named "S.O." was involved,[3] and then said that S.O. tried to sell him a .357 pistol for $300, which S.O. indicated had come from Haiss's house. According to Detective Hollowell, appellant did not indicate that he was afraid of S.O. or threatened by him. Moreover, appellant denied participating, or being forced to participate, in the crime.

---

**2.** The DVD recording of the interview was entered into evidence as State's Exhibit 12. However, the portions of the DVD that were played for the jury were not transcribed by the court reporter. Instead, the trial transcript contains notations of the exact start and end times of the portions that were played for the jury. By Order issued March 3, 2008, this Court ordered that the record on appeal be supplemented with a copy of the DVD. In our factual summary, we have included certain portions of appellant's statement, gleaned from the DVD entered into evidence. We note that, in their briefs, the parties have quoted portions of the DVD interview, citing to the time code embedded in the DVD recording.

**3.** "S.O." was later identified by police as Sean Hill. The prosecutor informed the court that Hill was arrested in connection with the investigation, but had not yet been tried.

Detective Bernard Nelson conducted the next portion of the interview. He testified that appellant informed him that he had lived with his aunt and uncle, next door to Haiss. He admitted that he had been inside Haiss's home on occasion, and had seen weapons. Appellant described S.O. as a friend, to whom he often spoke on the telephone. Appellant told Detective Nelson that he had called S.O. recently because he had not heard from him for awhile. Detective Nelson asked appellant several times if he had been forced or compelled to participate in the crime, and appellant continued to deny any involvement.

As the interview progressed, appellant admitted to Nelson that the week before the murder, S.O. and another person named "Vel" asked him for information about Haiss, including his age, his schedule, whether other persons lived at his house, whether the house had an alarm system, and the type and number of weapons that Haiss owned. In appellant's account to Nelson, S.O. and Vel told him they planned to knock on the door of Haiss's house, and then one of them would "[f]uck him up once he opened the door."

According to Nelson, appellant later told him that, on the day of the crime, S.O. and Vel came to appellant's job, and appellant asked S.O. for a ride home from work. Instead, S.O. drove Vel and appellant to Cree Drive, explaining that he and Vel needed appellant to knock on Haiss's door, because Haiss knew appellant and would open the door for him.

We discern that the following colloquy from the DVD was played for the jury:

NELSON: And when you got off of work, they picked you up from work, they called you and told you they were getting you that day? Or how long did you—[crosstalk]—how long before that did you know they were going to come and get you?

APPELLANT: I didn't. They came up there, and was like, can I get them some food? And I got them some food, and I was like, man, I get off in a little bit, why don't you just

run me home, you know what I'm saying, so I don't have to catch the bus.

NELSON: Mm-hmm.

APPELLANT: And he was like, alright, I gotta talk to you about some things anyway.

NELSON: Mm-hmm.

APPELLANT: So I get in the car, and we driving toward Forest Heights, and I'm like, I don't live this way. He's like, I know where you live at. I'm like, so where you going? He's like, we're just going through Forest Heights real quick. I'm like, wait, man, you know what I'm saying, I got shit I have to do. He's like, all I need you to do is answer the—knock on the door, so the dude can answer the door. I'm like, the fuck, I don't, you know what I'm saying, I don't want nothing to do with this shit. *He was like, man, it's GBA,*[4] *you get down or you lay down, you gonna be with that old man in the house or you gonna leave out the house with us, which one you wanna do? I was like, I'll knock on the door.* (Emphasis added.)

Detective Nelson testified that at one point appellant said S.O. and Vel instructed him not to enter the house because Haiss knew him. The following colloquy at trial is relevant:

[PROSECUTOR]: At any time did the Defendant explain why the others would be concerned about him going into the house because Mr. Haiss knew him, but there was no concern about him knocking on the door when Mr. Haiss knew him?

[NELSON]: He didn't explain that. But I tried to tell him that he would have known you because he opened the door for you, but now you're saying you didn't go in because the victim would have known you. It didn't make much sense.

---

**4.** Detective Nelson explained that "GBA" is a slang abbreviation for "guilty by association," and connotes that "you are either with us or you're not."

As Nelson recounted, appellant never clearly explained why Haiss's recognition of him would have been a bar to his entry to the house, but not to his knocking on the door:

[PROSECUTOR]: Initially, when the Defendant told you that S.O. and Vel ... didn't want him to go inside the house because Mr. Haiss knew him, did there ever come a time that the Defendant indicated any other reasons why he didn't go into the house?

[NELSON]: Well, he tried to stay with the story that they didn't want him to go in because the victim would recognize him. He said that he didn't want to go in because he didn't want to be involved. But at the same time S.O. was telling him, "Either you stay in the house with the old man or you leave with us." So he had a choice to make. And that was the reason why he was saying, he kept saying he did not go into the house, but at the same time they were saying, "You stay in the house with the old man or you leave with us, one or the other."

[PROSECUTOR]: Did the Defendant ever explain to you how he could be threatened with, "Either you stay in the house with the old man or leave with us," if he never went in the house?

[NELSON]: No.

[PROSECUTOR]: Did he ever explain how he could be left in a house that he never went into?

[NELSON]: No.

[PROSECUTOR]: Did you ever ask him whether or not he was aware, or whether or not he knew that this would end in Mr. Haiss' death?

[NELSON]: He didn't say it in so many words, but that quote from S.O., I would think that was part of the conversation, that was the conclusion you had to come to.

[PROSECUTOR]: Well, did he ever explain to you how being left in the house with a man that he grew up with was a threat if that man wasn't going to be hurt?

[NELSON]: No.

[PROSECUTOR]: Did there ever come a time—well, at any time did he say that any weapons were used to threaten him to get him to be involved in this?

[NELSON]: No.

Detective Nelson testified that he asked appellant several times whether appellant had gone to the door and knocked for S.O. and Vel. Nelson recounted that at one point he put his hand on appellant's shoulder to show compassion, and told appellant that he knew he was lying because his story kept changing. The segment of the interview that the detective described was played for the jury. In that segment, the detective said to appellant: "You felt pressure to do that for them. If you didn't do it, you'd probably be dead right now, don't you think?" Appellant replied, "I'd probably be dead because they killing everybody."

According to Nelson, appellant eventually admitted that he was the one who knocked on the door. Nevertheless, his account remained inconsistent. Appellant variously said that he left the scene immediately after knocking on the door; that he left and sat in the green SUV that the group had driven to the scene; and he emerged from the SUV and told the others inside the house to hurry. According to Nelson, appellant also said the green SUV belonged to S.O.'s girlfriend, and that he had driven it to Haiss's house. In one account, appellant told Nelson that, after Vel and S.O. exited the house, they got back into the SUV, went to someone's house to "play" with the weapons, and S.O. then took him home.

Further, Nelson recounted that appellant told him that, on the day after the incident, S.O. and Vel visited appellant and told him not to tell anyone about what had happened. Appellant also said that Vel told him details of the crime: Once inside the house, Vel had started beating Haiss; S.O. and Vel found one gun, but Haiss denied having any others; they found the safe, and forced Haiss to open it; and according to appellant's recitation, S.O. struck Haiss in the head with a baseball bat and threatened to cut off his fingers with a "hacksaw." Given that a hatchet was recovered from the

crime scene, the detective speculated that appellant might have confused the hatchet with a hacksaw.

In addition, Nelson testified that appellant told him that, "when S.O. came to his apartment the following day, he had the .357 with him and then walked him to a back bedroom and started to put bullets into it. . . ." According to appellant's recitation, S.O. asked appellant if he had talked to anyone about what happened, and appellant told him no. As reported by appellant to Nelson, S.O. responded: "Good, because I don't want any harm to come to you."

Antonio Gooding, an acquaintance of appellant, testified that around Thanksgiving 2005, appellant offered to sell him a gun for "[t]hree or four hundred dollars." Gooding declined.

Victoria Wynn, S.O.'s former girlfriend and the owner of the green SUV, testified that around Thanksgiving 2005, she saw appellant and S.O. in the living room of her apartment with an unspecified number of shotguns. She did not know where the weapons came from, but asked S.O. to remove them from her apartment. According to Wynn, appellant did not appear scared, or act as though he were forced to be present.

Devonshire Majors, another acquaintance of appellant and his relative by marriage, testified that around November 2005, she heard appellant tell S.O., a person named "Darvel," [5] and Majors's boyfriend, Demetrius, that he "got a move to go on with something, other people I guess." She explained: "A move can be different crimes, any type of crime. A move can be a robbery. A move can be anything." According to Majors, appellant said that the move was going to be against someone on his "old street," Cree Drive, and that he had been watching a house there.

Majors recalled that around Thanksgiving, appellant offered to sell her boyfriend a gun. At the time, appellant either had a rifle or a shotgun in his pants at the time. Majors heard about Haiss's death on television. She subsequently heard

---

**5.** Majors did not clarify whether "Darvel" and "V el" are the same person, although it appears that they are.

appellant tell her boyfriend that appellant had to "roll out" and "can't come around no more."

Majors admitted that she had initially told the police that S.O. had been the one with the gun in his pants, talking to her boyfriend. She also admitted that when she was initially interviewed by police, she felt that by talking to them she could help her boyfriend, who was jailed on unrelated charges. She insisted, however, that her boyfriend's case was over before appellant's trial, and that she could not help her boyfriend's case by testifying in this case.

After unsuccessfully moving for a judgment of acquittal, appellant rested without presenting evidence. In the discussion of jury instructions, the following colloquy ensued:

[DEFENSE COUNSEL]: I also am requesting ... the duress instruction, because at that point when he realizes, his testimony, they brought him to the scene, then he realizes the man is home and they threaten him.

\* \* \*

THE COURT: ... My recollection is that the law is very clear that duress must be imminent. It must be—

[DEFENSE COUNSEL]: Correct, Your Honor.

THE COURT:—a threat of direct physical harm to the individual at that moment.

[DEFENSE COUNSEL]: Correct. That's absolutely correct.

THE COURT: Not weeks later, or weeks before.

[DEFENSE COUNSEL]: Correct.

THE COURT: And I don't think there was any evidence of, he was in immediate and impending danger of death or serious bodily harm if he did not participate in this crime.

[DEFENSE COUNSEL]: Well, I would beg to differ on that. Even the Detective's testimony, I mean—

THE COURT: The Detective's testimony I think was that—and I can be wrong, but my recollection was it was

only after the fact where they were threatening him not to tell.

[DEFENSE COUNSEL]: No. No. His testimony was, he talked about, "You felt compelled to do it. You felt compelled." And then the Detective actually said, "You thought you would be dead if you didn't."

THE COURT: Right.

[DEFENSE COUNSEL]: That's at the time of the event.

THE COURT: Then he changed his story after that. I mean, that was just to get the Defendant to give a statement, and then the Defendant's ultimate statement was different than that. But the bottom line is, in order for duress to occur, there has to be a situation in which someone is, in effect, holding a gun to his head at the time that he commits the crime, and that didn't happen. There is no evidence that happened.

[DEFENSE COUNSEL]: I agree, Your Honor, but—

THE COURT: And the testimony, even taken in the light most favorable to the Defendant, is what it says here as the defense of duress is not established by proof that the Defendant had been threatened with violence at an earlier time. So the mere fact that he was threatened—

[DEFENSE COUNSEL]: I'm not arguing that at all, Your Honor.

THE COURT:—not to participate, doesn't do it.

[DEFENSE COUNSEL]: Only right at the scene. The Detective said, "You felt compelled. You would be dead if you didn't do it," and his—

THE COURT: But that was the Detective's statement.

[DEFENSE COUNSEL]: Yes. And my client's response was, "Yes, they killed everybody," basically.

THE COURT: But that isn't—there was no—I don't think there's anything in the statement that says that anybody was threatening him at that moment, that he actually had—

[DEFENSE COUNSEL]: I think that's exactly what the testimony was. And that's why I cross-examined and

showed him on the video because he couldn't remember saying the word "compelled" as far as "You would be dead if you didn't." There's no need for the gun there because, obviously, he knows these people are bad people. . . .

\* \* \*

THE COURT: [T]here's no evidence that at that very moment of the commission of the crime, anyone was threatening to harm the Defendant. I think the Defendant's own statements don't say, "They dragged me up to the front door and forced me to talk to the man." No—there is no indication that is what happened. The fact that someone said, "Harm will come to you afterwards if you don't participate," isn't enough.

\* \* \*

[DEFENSE COUNSEL]: Well, I think that's a factual— that's a fact. Those are the facts in evidence that I can argue to the jury as far as his intent. Plus, it goes even further, because I mean, we have an aiding and abetting which requires, one of the elements is willful participation—

THE COURT: Okay. So, you've got the aiding and abetting, so we've already covered that. As far as I'm concerned, aiding and abetting is already covered. Whether or not the jury finds that he was a voluntary participant. If they find he wasn't a voluntary participant, then they can say that they found that he did not aid and abet the murder of Mr. Haiss. And that is where it will go. But—

[DEFENSE COUNSEL]: That's why I'm asking.

THE COURT:—and they may also feel that he was not a willing participant in the robbery. And if they do, then they will find him not to be guilty of the offense. But that—I think those are the arguments you can make. I'm not going to give them the separate instruction on duress.

[DEFENSE COUNSEL]: Just so the record is clear—

THE COURT: You may take exception to that.

[DEFENSE COUNSEL]:—because of the underlying felony of robbery, duress would be usable in that. Had Mr. Haiss not died, the duress would be available under underlying robbery.

THE COURT: Under your theory. And I've just said, no, I feel that it's entirely covered by the aiding and abetting instruction, which covers the voluntariness issue. I do not find that this case has any evidence that rises to the point of duress as an element, and I'm not going to instruct the jury to that extent. You may note your exception at this time. I will not give the duress instruction.

Pursuant to its earlier ruling, the court did not propound a duress instruction. As to aiding and abetting, the court gave the following instructions, without objection:

Now the Defendant is charged with the crime of murder. A person who aids and abets in the commission of a crime is as guilty as the actual perpetrator, even though he did not personally commit each of the acts that constitute the crime. A person aids and abets the commission of a crime by knowingly associating with the criminal venture with the intent to help commit the crime, being present when the crime is committed, and seeking, by some act, to make the crime succeed.

In order to prove that the Defendant aided and abetted the commission of a crime, the State must prove: That the Defendant was present when the crime was committed; and *that the Defendant willfully participated with the intent to make the crime succeed.*

\* \* \*

*Willful participation means voluntary and intentional participation in the criminal act.* (Emphasis added.)

As to reasonable doubt, the court instructed as follows, without objection:

The State has the burden of proving the guilt of the Defendant beyond a reasonable doubt. This burden remains on the State throughout the trial. The Defendant is

not required to prove his innocence. However, the State is not required to prove guilt beyond all possible doubt or to a mathematical certainty. Nor is the State required to negate every conceivable circumstance of innocence.

A reasonable doubt is a doubt founded upon reason. *It is not a fanciful doubt, a whimsical doubt or a capricious doubt.* Proof beyond a reasonable doubt requires such proof as would convince you of the truth of a fact to the extent that you would be willing to act upon such belief without reservation in your own business or personal affairs. However, if you are not satisfied of the Defendant's guilt to that extent, then reasonable doubt exists and the Defendant must be found not guilty. (Emphasis added.)

In his summation, appellant's counsel essentially argued coercion. We quote a portion of his closing remarks:

Why would they say, "We'll leave you here with the old man"? My understanding of all that is, my client testified that "I'm being threatened to go there." And the officer says, "So you felt compelled to go."

\* \* \*

Now, all that is *threats at the time when this is all happening.* Because my client's statement, no matter how many times he lied to get to what Detective Nelson felt was, you know, a usable statement on him, *his statement is, that they had forced him and needed to use him to get Mr. Haiss to open the door* .... And his response was, "Yeah, they're killing everybody."

So, he knew. He didn't say they had a gun to his head. They didn't need guns to threaten him. They certainly didn't need a gun to kill Mr. Haiss.

\* \* \*

I suggest to you he did not willfully do it. I don't know how many times the story changed, he did not willfully go there. He did not willfully want to kill Mr. Haiss. And he did not want to place any harm on Mr. Haiss.

* * *

[H]e's stuck in the car, and they tell him, "You're coming with us or we're going to leave you here." If somebody tells me that, I think if they're going to leave me there, is not a good position. And knocking on the door might be just enough to get it over with. But by knocking on that door, he opened a can of worms he's going to regret for the rest of his life.

We shall include additional facts in our discussion.

## DISCUSSION

### I.

Appellant contends that the trial court erred in refusing to propound a jury instruction as to the defense of duress. He concedes that the evidence of duress was "slim and inconclusive," and was contradicted by other evidence, including some of his own statements during the interrogation. Nevertheless, he insists that his pre-trial statements were sufficient to entitle him to the instruction. In particular, he points to his affirmative response to Detective Nelson's comment that if he (appellant) had not participated in Haiss's robbery, he would "probably be dead right now." In his view, a jury could reasonably have chosen to credit his claim that he was coerced to participate, and thus the evidence sufficed to overcome the minimal evidentiary threshold required for the duress instruction.

At the outset, the State questions whether a duress instruction would be available to appellant under any circumstance, given that appellant was charged with murder. Quoting *Frasher v. State*, 8 Md.App. 439, 260 A.2d 656, *cert. denied sub nom. McLaughlin v. Director, Patuxent Inst.*, 400 U.S. 959, 91 S.Ct. 360, 27 L.Ed.2d 269 (1970), a narcotics case, the State claims that duress "is a defense as to all crimes except taking the life of an innocent person...." *Id.* at 447. According to the State, this principle "suggests that the defense is not available for first degree felony murder, and that the trial

court properly denied McMillan's request for the instruction. . . ." Moreover, the State observes that appellant "does not cite any Maryland authority for the proposition that the defense of duress is available for an underlying felony under the felony murder doctrine."

In his reply brief, appellant insists that duress is available as a defense to felony-murder. He cites *Wentworth v. State,* 29 Md.App. 110, 349 A.2d 421 (1975), *cert. denied,* 278 Md. 735 (1976), as well as several cases from other jurisdictions, in support of that proposition. *See, e.g., People v. Anderson,* 28 Cal.4th 767, 122 Cal.Rptr.2d 587, 50 P.3d 368, 379 (Cal.2002); *Wright v. State,* 402 So.2d 493, 498–99 n. 8 (Fla.Ct.App.1981); *People v. Serrano,* 286 Ill.App.3d 485, 222 Ill.Dec. 47, 676 N.E.2d 1011, 1015 (1997), *cert. denied,* 173 Ill.2d 541, 226 Ill.Dec. 137, 684 N.E.2d 1340 (1997); *State v. Dunn,* 243 Kan. 414, 758 P.2d 718, 725 (1988); *People v. Campos,* 108 A.D.2d 751, 484 N.Y.S.2d 907, 908 (1985); *Tully v. State,* 730 P.2d 1206, 1210 (Okla.Crim.App.1986); *Pugliese v. Commonwealth,* 16 Va.App. 82, 428 S.E.2d 16, 26 (1993).

We pause to review the felony-murder doctrine, as it is pertinent to the parties' contentions.

" 'Murder is the killing of one human being by another with the requisite malevolent state of mind and without justification, excuse, or mitigation.' " *Thornton v. State,* 397 Md. 704, 724, 919 A.2d 678 (2007) (citation omitted). Under Maryland law, murder remains a common law crime. But, by statute, it has been divided into two degrees for purposes of punishment. *Clemons v. State,* 392 Md. 339, 345 n. 2, 896 A.2d 1059 (2006); *Roary v. State,* 385 Md. 217, 231 n. 12, 867 A.2d 1095 (2005); *Sifrit v. State,* 383 Md. 116, 138, 857 A.2d 88 (2004); *Mitchell v. State,* 363 Md. 130, 146, 767 A.2d 844 (2001); *Burch v. State,* 346 Md. 253, 696 A.2d 443, *cert. denied,* 522 U.S. 1001, 118 S.Ct. 571, 139 L.Ed.2d 410 (1997).[6]

---

**6.** As we explained in *Smith v. State,* 41 Md.App. 277, 294, 398 A.2d 426, *cert. denied,* 284 Md. 748 (1979), "the dividing of murder into degrees

Maryland Code (2002, 2007 Supp.), § 2–201 of the Criminal Law Article ("C.L."), defines first-degree murder:

### § 2–201. Murder in the first degree.

(a) *In general.*—A murder is in the first degree if it is:

(1) a deliberate, premeditated, and willful killing; [7]

(2) committed by lying in wait;

(3) committed by poison; or

(4) committed in the perpetration of or an attempt to perpetrate [any of twelve enumerated felonies, including]:

\* \* \*

(ix) robbery....

\* \* \*

(b) *Penalty.*—(1) A person who commits a murder in the first degree is guilty of a felony and on conviction shall be sentenced to:

(i) death; [8]

(ii) imprisonment for life without the possibility of parole; or

(iii) imprisonment for life.

Under C.L. § 2–204, "[a] murder that is not in the first degree under [C.L.] § 2–201 ... is in the second degree," and is punishable by "imprisonment not exceeding 30 years."

---

... did not raise the punishment for murder in the first degree; it only lowered the punishment for murder in the second degree."

**7.** In *Lipinski v. State,* 333 Md. 582, 636 A.2d 994 (1994), the Court explained that " 'to conclude that the defendant premeditated the killing [the fact finder] must find that the defendant had sufficient time to consider the decision whether or not to kill and weigh the reasons for or against such a choice.' " *Id.* at 589, 636 A.2d 994 (quoting *Willey v. State,* 328 Md. 126, 138, 613 A.2d 956 (1992)).

**8.** The death penalty is only available for certain particularly heinous first-degree murders in which one or more "aggravating circumstances" are present, and generally only where the defendant is a principal in the first degree. *See* C.L. §§ 2–202 & 2–303.

■ Four malevolent states of mind may support a conviction of murder: (1) the intent to kill; (2) the intent to inflict such grievous bodily harm that death would be the likely result; (3) the intent to do an act under circumstances that manifest a "depraved heart," i.e., an extreme indifference to the value of human life; and (4) the intent to commit a dangerous felony. *Thornton*, 397 Md. at 724–25 & 741, 919 A.2d 678; *Ross v. State*, 308 Md. 337, 340, 519 A.2d 735 (1987). This fourth state of mind encompasses the common law felony-murder doctrine. The Court of Appeals explained in *Roary*, 385 Md. at 226–27, 867 A.2d 1095:

> "At common law one whose conduct brought about an unintended death in the commission or attempted commission of a felony was guilty of murder." Wayne R. LaFave, *Substantive Criminal Law* § 14.5 (2d ed.2003). The modern felony-murder rule is "intended to deter dangerous conduct by punishing as murder a homicide resulting from dangerous conduct in the perpetration of a felony, even if the defendant did not intend to kill." *Fisher v. State*, 367 Md. 218, 262, 786 A.2d 706 (2001). The doctrine recognizes that in society's judgment, "an intentionally committed [felony] that causes the death of a human being is qualitatively more serious than an identical [felony] that does not." Crump & Crump, *In Defense of the Felony Murder Doctrine*, 8 Harv. J.L. & Pub. Pol'y 359, 363 (1985).

■ In *State v. Allen*, 387 Md. 389, 875 A.2d 724 (2005), the Court recognized that, under the modern view of felony-murder, the commission of the underlying felony or its attempt do not " 'simply *imply* malice; it is rather the case that they *are* malice by definition.' " *Id.* at 403, 875 A.2d 724 (quoting Charles E. Moylan, Jr., CRIMINAL HOMICIDE LAW § 5.1 at 105 (2002) ("Moylan") (Moylan's emphasis)). What the Court said in *Watkins v. State*, 357 Md. 258, 267, 744 A.2d 1 (2000), is also relevant (internal citations omitted):

> Under Maryland common law, a homicide arising in the commission of [a dangerous] felony is murder "whether death was intended or not, the fact that the person was engaged in such perpetration or attempt being sufficient to

supply the element of malice." That substituted form of malice represents, in a way, a vertical extension of the normal requirement that, for a homicide to constitute murder, the defendant must intend to kill the victim. It has also long been established that, under the felony-murder doctrine, a participating felon is guilty of murder when a homicide has been committed by a co-felon in furtherance of the underlying felony. That extension, which invokes the rule of accomplice liability, is, in essence, a horizontal one, making culpable other persons, who did not actually commit the homicide and who may, in fact have earnestly desired that it not have happened.

*See also Moylan,* § 5. 1, at 106; *Evans v. State,* 28 Md.App. 640, 686 n. 23, 349 A.2d 300 (1975), *aff'd,* 278 Md. 197, 362 A.2d 629 (1976).

■ The felony-murder doctrine applies to both first- and second-degree murder. The General Assembly's "delineat[ion of] murder into degrees for purposes of punishment, did not alter the common law felony-murder doctrine." *Roary,* 385 Md. at 231 n. 12, 867 A.2d 1095. As we explained in *Harvey v. State,* 111 Md.App. 401, 407, 681 A.2d 628, *cert. denied,* 344 Md. 330, 686 A.2d 635 (1996), if a homicide occurred in the perpetration or attempted perpetration of one of the felonies enumerated in C.L. § 2–201(a)(4),[9] all participants in the underlying felony would be guilty of murder in the first degree. "Their individual intents would be immaterial, provided only that they had the necessary intent to commit the underlying felony." *Id.* at 407–408, 681 A.2d 628. On the other hand, "[i]f the felony should be one of the residual felonies under the common law felony-murder doctrine and not one of those listed in [C.L. § 2–201(a)(4) ], the guilt of all participants would then be murder in the second degree, under the common law felony-murder doctrine." *Id.* at 408,

---

9. At the time of the *Harvey* decision, C.L. § 2–201 was codified at Md.Code Ann., Art. 27, §§ 408–410. *Harvey,* 111 Md.App. at 407, 681 A.2d 628.

681 A.2d 628.[10] Once the felony-murder doctrine " 'has already operated,' " C.L. § 2–201(a)(4) is triggered to determine whether " 'the *already established murder* shall be punished as murder in the first degree,' " because of the involvement of one of the felonies specifically designated in the statute. Moylan, § 5.1 at 106 (citation omitted).

With these principles in mind, we turn to consider the defense of duress, which was explicated in *Frasher, supra,* 8 Md.App. at 447, 260 A.2d 656. There, Chief Judge Orth explained for the Court that "it is a defense as to all crimes except taking the life of an innocent person that the defendant acted under a compelling force of coercion or duress." *Id.* at 447–48, 260 A.2d 656. Distilling the requirements of the defense, the Court said:

In order to constitute a defense, *the duress by another person on the defendant must be present, imminent, and impending, and of such a nature as to induce well grounded apprehension of death or serious bodily injury if the act is not done. It must be of such a character as to leave no opportunity to the accused for escape.* Mere fear or threat by another is not sufficient nor is a threat of violence at some prior time. The defense cannot be raised if the apprehended harm is only that of property damage or future but not present personal injury. However, there appears to be accord that the defense cannot be claimed if the compulsion arose by the defendant's own fault, negligence or misconduct.

*Id.* at 449, 260 A.2d 656 (emphasis added; internal citations and footnote omitted); *see also Williams v. State,* 101 Md. App. 408, 412–26, 646 A.2d 1101 (1994), *cert. denied,* 337 Md. 90, 651 A.2d 855 (1995); *Wentworth,* 29 Md.App. at 118, 349

---

**10.** At present, there is no definitive answer under Maryland law as to which unenumerated felonies may elevate a homicide to second-degree murder. *See generally* Moylan, § 5.1 at 107–114. But, there is at least an "arguable requirement that a felony must be 'dangerous to human life' in order to qualify for the common law felony-murder doctrine." *Id.* at 109. *See Fisher v. State,* 367 Md. 218, 786 A.2d 706 (2001). In any event, so-called "second-degree felony-murder" is not invoked here.

A.2d 421. Nevertheless, "the question of what acts are sufficient to constitute duress is a matter for the determination of the jury." *Frasher*, 8 Md.App. at 449–50, 260 A.2d 656.

The Maryland Criminal Pattern Jury Instructions ("MPJI–CR") provide the following instruction on duress in MPJI–CR 5:03:

> You have heard evidence that the defendant acted under the influence of an overpowering force. This is called duress. Duress will excuse an act that would otherwise be criminal. You are required to find the defendant not guilty if all of the following four factors are present:
>
> (1) the defendant actually believed that the duress placed [him][her] in immediate and impending danger of death or serious bodily harm;
>
> (2) the defendant's belief was reasonable;
>
> (3) the defendant had no reasonable opportunity for escape; and
>
> (4) the defendant committed the crime because of the duress.
>
> The defense of duress is not established by proof that the defendant had been threatened with violence at an earlier time. [He][she] must have been under a present threat at the time of the actual commission of the crime charged.
>
> In order to convict the defendant, the State must prove that the defendant did not act under duress. This means that you are required to find the defendant not guilty unless the State has persuaded you, beyond a reasonable doubt, that at least one of the four factors of duress was absent.

As noted, appellant and the State dispute whether duress can be a defense to felony-murder. The State cites *Wentworth, supra,* 29 Md.App. 110, 349 A.2d 421, for the proposition that "the law, as a matter of social policy, has declared that the defense of duress may not extend to the taking of an innocent person's life." *Id.* at 118–19, 349 A.2d 421. In his reply brief, appellant accuses the State of selective quotation from *Wentworth,* and argues that the State's position is, in fact, foreclosed by *Wentworth's* holding. Although the state-

ments from *Wentworth* upon which appellant relies were dicta, we agree with appellant that *Wentworth* supports the proposition that duress may be a defense to felony-murder, and we adopt that proposition. We explain.

In *Wentworth,* stating that "the law is now clear," we quoted the following passage from Professors LaFave and Scott:

"It has been held that duress cannot justify murder—or, as it is better expressed (since duress may justify the underlying felony and so justify what would otherwise be a felony murder), duress cannot justify the intentional killing of (or attempt to kill) an innocent third person."

29 Md.App. at 119, 349 A.2d 421 (quoting LaFave & Scott, CRIMINAL LAW 376 (1972)) ("LaFave"). Appellant further quotes LaFave, at 377:

The law properly recognizes that one is justified in aiding a robbery if he is forced by threats to do so to save his life; he should not lose the defense because his threateners unexpectedly kill someone in the course of the robbery and thus convert a mere robbery into a murder.

Although the *Wentworth* Court discussed duress in the context of murder, felony-murder was not at issue in that case, and the Court's elucidation of the application of the duress defense to felony-murder was dictum. Other than *Wentworth,* we have not uncovered any reported Maryland decision that has addressed this issue.

Among the states that retain the common law felony-murder doctrine [11] and have considered whether duress may relieve a defendant of liability for felony-murder by operating as a defense to the underlying felony, a majority of jurisdictions have determined that duress is available as a defense. *See People v. Hinton,* 37 Cal.4th 839, 38 Cal.Rptr.3d 149, 126 P.3d

---

**11.** Several states have abolished the felony-murder doctrine altogether, either by statute or judicial decision. *See generally* W.E. Shipley, *Judicial Abrogation of Felony–Murder Doctrine,* 13 A.L.R.4th 1226 (1982, 2008 Supp.). Maryland has not done so, and appellant does not question the vitality of the felony-murder doctrine in Maryland.

981, 1015 (2006) (citing *Anderson, supra,* 122 Cal.Rptr.2d 587, 50 P.3d at 379), *cert. denied,* —— U.S. ——, 127 S.Ct. 581, 166 L.Ed.2d 434 (2006); *People v. Sims,* 374 Ill.App.3d 231, 312 Ill.Dec. 124, 869 N.E.2d 1115, 1145 (2007), *cert. denied,* 226 Ill.2d 604, 316 Ill.Dec. 549, 879 N.E.2d 937 (2007); *State v. Hunter,* 241 Kan. 629, 740 P.2d 559, 568–69 (1987); *Tully, supra,* 730 P.2d at 1210; *Pugliese, supra,* 428 S.E.2d at 26. As the basis for their decisions, several of these courts have explicitly adopted Professor LaFave's reasoning, as quoted in *Wentworth. See, e.g., Anderson,* 122 Cal.Rptr.2d 587, 50 P.3d at 379; *Hunter,* 740 P.2d at 568; *Tully,* 730 P.2d at 1210; *Pugliese,* 428 S.E.2d at 26. Additionally, in some states, duress may be a defense to any crime, including murder. *See, e.g., MacKool v. State,* 363 Ark. 295, 213 S.W.3d 618, 623 (2005); *State v. Heinemann,* 282 Conn. 281, 920 A.2d 278, 290 (2007). *But cf. People v. Moseler,* 202 Mich.App. 296, 508 N.W.2d 192, 194 (1993) (rejecting duress defense to involuntary manslaughter), *cert. denied,* 445 Mich. 919, 519 N.W.2d 899 (1994). Moreover, the state courts that have rejected the proposition that duress may be a defense to felony-murder have done so on the basis of state statutes that explicitly limit the scope of the duress defense, a situation that does not obtain in Maryland. *See, e.g., State v. Ellison,* 213 Ariz. 116, 140 P.3d 899, 914 (2006), *cert. denied,* —— U.S. ——, 127 S.Ct. 506, 166 L.Ed.2d 377 (2006); *State v. Encinas,* 132 Ariz. 493, 647 P.2d 624, 626–27 (1982); *Moore v. State,* 697 N.E.2d 1268, 1273 & n. 2 (Ind.App.1998); *State v. Rumble,* 680 S.W.2d 939, 942 (Mo.1984); *State v. Ng,* 110 Wash.2d 32, 750 P.2d 632, 636 (1988).[12] As appellant observes, "Maryland does not have

---

**12.** Several other jurisdictions have recognized the issue, some with favorable dicta on the proposition that duress may be a defense to felony-murder, but have not definitively resolved the issue. *See, e.g., Wright, supra,* 402 So.2d at 498 n. 8; *State v. Proctor,* 585 N.W.2d 841, 844 (Iowa 1998); *Commonwealth v. Robinson,* 382 Mass. 189, 415 N.E.2d 805, 813 n. 14 (1981); *State v. Dissicini,* 316 A.2d 12, 16 n. * (N.J.Super.Ct.App.Div.1974), *aff'd,* 66 N.J. 411, 331 A.2d 618 (1975); *Campos, supra,* 484 N.Y.S.2d at 908; *State v. Gay,* 334 N.C. 467, 434 S.E.2d 840, 854 & n. 3 (1993); *State v. Bockorny,* 124 Or.App. 585, 863 P.2d 1296, 1298 (1993), *cert. denied,* 318 Or. 351, 870 P.2d 220 (1994).

such a law"; duress remains a common law defense in Maryland.

 At common law, the rationale for barring the duress defense in a prosecution for murder was that a person "ought rather to die himself than escape by the murder of an innocent." 5 BLACKSTONE'S COMMENTARIES 30. This rationale disappears when the sole ground for the murder charge is that the defendant participated in an underlying felony, under duress, and the defendant's co-felons unexpectedly killed the victim, thereby elevating the charge to felony-murder. We conclude that if duress would serve as a defense to the underlying felony, it is also available as a defense to a felony-murder arising from that felony, assuming the criteria for such a defense are otherwise satisfied. Therefore, we shall proceed to consider whether, under the circumstances of this case, appellant was entitled to a jury instruction as to the defense of duress.

## II.

 The responsibility of a judge to instruct the jury in a criminal trial is governed by Maryland Rule 4–325 (2008), which provides: "The court may, and at the request of any party shall, instruct the jury as to the applicable law. . . ." But, "[t]he court need not grant a requested instruction if the matter is fairly covered by instructions actually given." On review, we " 'must determine whether the requested instruction was a correct statement of the law; whether it was applicable under the facts of the case [*i.e.*, whether the evidence was sufficient to generate the desired instruction]; and whether it was fairly covered in the instructions actually given.' " *Janey v. State*, 166 Md.App. 645, 654, 891 A.2d 355 (quoting *Gunning v. State*, 347 Md. 332, 348, 701 A.2d 374 (1997)), *cert. denied*, 392 Md. 725, 898 A.2d 1005 (2006).

 " 'As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor.' " *General v. State*, 367 Md. 475, 486, 789 A.2d 102

(2002) (quoting *Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988)). Whether the requested instruction is applicable to the facts is a question of law, *Roach v. State*, 358 Md. 418, 428, 749 A.2d 787 (2000), which "turns on whether there is any evidence in the case that supports the instruction." *Dishman v. State*, 352 Md. 279, 292, 721 A.2d 699 (1998); *see Riggins v. State*, 155 Md.App. 181, 222, 843 A.2d 115, *cert. denied*, 381 Md. 676, 851 A.2d 595 (2004).

 This threshold is not high. A criminal defendant is entitled to an accurate jury instruction so long as the defendant " 'produced that minimum threshold of evidence necessary to establish a *prima facie* case that would allow a jury to rationally conclude that the evidence supports the application of the legal theory desired.' " *Cantine v. State* 160 Md.App. 391, 410–11, 864 A.2d 226 (2004) (citation omitted), *cert. denied*, 386 Md. 181, 872 A.2d 46 (2005). Moreover, to ascertain whether "competent evidence exists to generate the requested instruction, we view the evidence in the light most favorable to the accused." *Fleming v. State*, 373 Md. 426, 433, 818 A.2d 1117 (2003); *accord Brogden v. State*, 384 Md. 631, 650, 866 A.2d 129 (2005).

 Put another way, a requested instruction must be given if there is "some evidence" that supports the defense theory. *Dykes v. State*, 319 Md. 206, 216, 571 A.2d 1251 (1990). In *Dykes*, the Court explained, 319 Md. at 216–17, 571 A.2d 1251:

> *Some evidence* is not strictured by the test of a specific standard. It calls for no more than what it says—"some," as that word is understood in common, everyday usage. It need not rise to the level of "beyond a reasonable doubt" or "clear and convincing" or "preponderance." The source of the evidence is immaterial; it may emanate solely from the defendant. It is of no matter that the ... claim is over-whelmed by evidence to the contrary. If there is any evidence relied upon by the defendant which, if believed, would support his claim ... the defendant has met his burden. (Emphasis in original.)

*See also Smith v. State,* 302 Md. 175, 181, 486 A.2d 196 (1985) (" '[A] defendant may offer uncorroborated testimony and thereupon become entitled to an instruction on such defenses as ... duress ....' ") (citation omitted); *Allen v. State,* 157 Md.App. 177, 184, 850 A.2d 365 (2004). *But see State v. Smullen,* 380 Md. 233, 268–274, 844 A.2d 429 (2004) (rejecting claim that defendant was entitled to self-defense instruction based on claim of battered child syndrome, because hearsay statements of the defendant alone were not sufficient evidence "of the kind of repetitive cycle of violence that lies at the heart of the [battered child] syndrome").

However, as we explained in *Marquardt v. State,* 164 Md.App. 95, 131, 882 A.2d 900, *cert. denied,* 390 Md. 91, 887 A.2d 656 (2005), "[t]here must be 'some evidence' to support *each element* of the defense's legal theory before the requested instruction is warranted." (Emphasis added.) And, "where the defendant's subjective belief at a particular time must be shown to generate a defense, only evidence bearing directly on that issue will suffice. Evidence of the defendant's subjective belief at some earlier time will not do." *State v. Martin,* 329 Md. 351, 368, 619 A.2d 992, *cert. denied,* 510 U.S. 855, 114 S.Ct. 161, 126 L.Ed.2d 122 (1993).

Appellant attributes three errors to the trial court in denying the requested instruction on duress. First, appellant contends that the court "usurped the jury's role as factfinder" by purporting to resolve the conflicts in his statements to police and "ignor[ing] Mr. McMillan's statements ... concerning the threats against his life because Mr. McMillan 'changed his story' during the overnight investigation." Second, appellant argues that the trial court erred to the extent that it based its ruling on the ground that "the issue of voluntariness was 'entirely covered by the aiding and abetting instruction.' " Finally, he insists that the trial court erred "in concluding that it was legally impossible for the jury to conclude that Mr. McMillan was under an imminent threat of harm at the time he participated" in Haiss's robbery.

While noting that appellant's statement was "rife with inconsistencies," the State does not rely on the inconsistency of appellant's statement to support its position. Instead, it argues: "Even in the light most favorable to McMillan, this evidence failed to make out a *prima facie* case of duress." The State maintains that, at the requisite point in time, there was no evidence that appellant was in fear of "immediate and impending" danger of death or serious bodily harm. MPJI–CR 5:03(1). It asserts: "The *detective's* statement to McMillan—that he must have felt 'pressured' to knock on the door or he would probably be dead right now—and McMillan's response—that he would *'probably* be dead'—is no substitute for the required evidence [of] imminent threat of death or serious physical injury." The State argues: "At most, McMillan was afraid of being hurt by 'S.O.' in the future, but he did not describe a fear of imminent harm at the time of the act."

Moreover, the State insists that, even if appellant were in fear of death or serious harm, there was no evidence to support the element that his fear was "well grounded," *Frasher,* 8 Md.App. at 449, 260 A.2d 656, or, in the words of the pattern instruction, "reasonable." MPJI–CR 5:03(2). "Indeed," comments the State, "there was *no* evidence regarding the nature of the alleged threat or how it might be carried out, only that they told McMillan they needed him to knock on the door."

In addition, the State maintains that appellant failed to adduce evidence supporting the third element, i.e., that he "had no reasonable opportunity to escape." MPJI–CR 5:03(3). In this regard, claims the State, appellant did not provide any reason to explain why he could not have run from S.O. and Vel. The State suggests that a particular avenue of escape might have been the home of appellant's aunt and uncle, who lived next door to Haiss.

Finally, the State rejects appellant's claim that the court's reliance on the aiding and abetting instruction was misplaced. It reasons:

The jury was instructed that the State must prove that the defendant was "present when the crime was committed; and that the Defendant *willfully participated* with the intent to make the crime succeed." As the trial judge pointed out, because the jury was required to find that McMillan was a voluntary participant, it could find that "he was not a willing participant in the robbery. And if they do, then they will find him not to be guilty of the offense." (Quoting trial court; State's emphasis).

As noted, appellant was merely required to adduce "some evidence" to support the instruction. In explaining the "some evidence" standard, the Court in *Dykes* was clear: "It is of no matter that the ... claim is overwhelmed by evidence to the contrary. If there is any evidence relied upon by the defendant which, if believed, would support his claim ... the defendant has met his burden." *Dykes*, 319 Md. at 217, 571 A.2d 1251.

Here, the trial judge commented on the inconsistencies in appellant's statement. Regarding appellant's assertion that he would "probably be dead" had he not participated in the robbery, the judge observed: "Then he changed his story after that." The court also alluded to appellant's inconsistent statements after defense counsel referred to appellant's statement that "they're killing everybody." The judge commented: "And that was midway through what he said...." It does not appear, however, that the judge relied on the inconsistencies in ruling on appellant's request. In particular, the judge stated: *"But the bottom line is, in order for duress to occur, there has to be a situation in which someone is, in effect, holding a gun to his head at the time that he commits the crime,* and that didn't happen. There is *no evidence* that happened." (Emphasis added.) The court continued: "And the testimony, *even taken in the light most favorable to the Defendant,* is what it says here as the defense of duress is not established by proof that the Defendant had been threatened with violence at an earlier time." (Emphasis added.) The remainder of the colloquy between court and counsel focused

on whether there was any evidence that the putative threat to appellant was imminent.

We are satisfied that, despite the court's references to appellant's contradictory statements, the court properly focused on whether appellant adduced "some evidence" of imminent threat. Therefore, appellant's claim is unavailing.

■ Even if the court had erroneously considered the contradictions, reversal would not be compelled. It is well established that,

> where the record in a case adequately demonstrates that the decision of the trial court was correct, although on a ground not relied upon by the trial court and perhaps not even raised by the parties, an appellate court will affirm. In other words, a trial court's decision may be correct, although for a different reason than relied on by that court.

*Robeson v. State,* 285 Md. 498, 502, 403 A.2d 1221 (1979), *cert. denied,* 444 U.S. 1021, 100 S.Ct. 680, 62 L.Ed.2d 654 (1980). *See also, e.g., Rush v. State,* 403 Md. 68, 103, 939 A.2d 689 (2008); *Gerald v. State,* 137 Md.App. 295, 305, 768 A.2d 140, *cert. denied,* 364 Md. 462, 773 A.2d 514 (2001).[13] If appellant was not entitled to the duress instruction, any error by the trial court in how it reached that conclusion would not prejudice appellant, because application of the correct principles would yield the same result. We shall discuss appellant's entitlement, *infra.*

Appellant also complains that the trial court erred when it said that appellant's duress argument was "entirely covered by the aiding and abetting instruction, which covers the voluntariness issue." The court reasoned:

---

**13.** To be sure, an appellate court should be cautious when deploying this precept. In *State v. Bell,* 334 Md. 178, 189, 638 A.2d 107 (1994), the Court commented that an appellate court's "discretion" to overlook a lower court's error "should be exercised only when it is clear that it will not work an unfair prejudice to the parties or to the court." *See also id.* at 189 n. 5, 638 A.2d 107. We discern no unfair prejudice here. Among other things, although the trial court did not give a duress instruction, the defense was permitted to argue a duress-like theory to the jury.

If [the jurors] find he wasn't a voluntary participant, then they can say that they found that he did not aid and abet the murder of Mr. Haiss ... and they may also feel that he was not a willing participant in the robbery. And if they do, then they will find him not to be guilty of the offense.

Thereafter, in accordance with MPJI–CR 6:01, the court instructed the jury that one of the elements of aiding and abetting was "that the Defendant wilfully participated with the intent to make the crime succeed." It added: "Willful participation means voluntary and intentional participation in the criminal act." The State argues that, "even if it were generated, an instruction on duress was not required in this case because it was fairly covered by the aiding and abetting instruction."

Maintaining that the trial court erred in relying on the aiding and abetting instruction to communicate the concept of duress, appellant contends:

The common law draws a sharp distinction between the presence of the *mens rea* necessary to commit or aid an offense and the existence of duress. It is entirely possible for a defendant to possess the *mens rea* necessary to aid and abet a crime and nevertheless to have provided such aid under duress.

Once again, appellant directs our attention to *Wentworth,* 29 Md.App. 110, 349 A.2d 421. There, we again quoted LaFave at 374–75, stating, 29 Md.App. at 117–18, 349 A.2d 421 (emphasis added):

"One who, under the pressure of an unlawful threat from another human being to harm him (or to harm a third person), commits what would otherwise be a crime may, under some circumstances, be justified in doing what he did and thus not be guilty of the crime in question. The requirement for this defense of duress is that a threat of a human being which operates upon the defendant's mind, rather than of the pressure of a human being which operates upon his body (as where A pushes B against C, causing C to fall over the cliff where the three are standing,

admiring the view). *The rationale of the defense is not that the defendant, faced with the unnerving threat of harm unless he does an act which violates the literal language of the criminal law, somehow loses his mental capacity to commit the crime in question. Rather, it is that, even though he has the mental state which the crime requires, his conduct which violates the literal language of the criminal law is justified because he has thereby avoided a harm of greater magnitude.* If A, armed with a gun, threatens B, a taxi driver, with death unless B drives him to the scene of a robbery planned by A, B is not guilty of the robbery which A commits at the scene, because it is better for society as a whole that B[do] the lesser harm (aid A in the robbery) than that B's life be lost."

Although *Wentworth* is instructive, it did not involve felony-murder. In the context of felony-murder, we have not located any Maryland case that has spoken directly to the interplay between duress and the "willful participation" or "voluntariness" element of aiding and abetting. To be sure, the State's position, apparently shared by the trial judge, is not devoid of logic. Indeed, in *Frasher* the Court seemed to equate "voluntariness" with lack of duress when it said, 8 Md.App. at 447–48, 260 A.2d 656 (emphasis added):

It is essential to a crime that the defendant committed a voluntary act. Voluntariness in this context has a limited meaning.... *The voluntary requirement of the criminal act relates directly to compulsion;* it is a defense as to all crimes except taking the life of an innocent person that the defendant acted under a compelling force of coercion or duress.

Nevertheless, we cannot endorse the proposition that the "voluntariness" component of an aiding and abetting instruction suffices, for purposes of Maryland Rule 4–325(a), to "fairly cover" the concept of duress. Thus, in factual circumstances that could support a duress defense, an instruction as to aiding and abetting would not relieve the trial court from its obligation to "instruct the jury as to the applicable law."

Were we to conclude otherwise, we would essentially render the duress instruction superfluous whenever a defendant's guilt is premised on accomplice liability, even in factual circumstances akin to the paradigmatic "gun to the head" example. Accordingly, we conclude that the aiding and abetting instruction is not a substitute for a duress instruction.

■ In the context of this case, the aiding and abetting instruction could not substitute for the duress instruction for yet another reason. Appellant was not charged separately with robbery. When the court instructed the jury as to aiding and abetting, it prefaced the instruction by saying, "Now the Defendant is charged with the crime of *murder*." (Emphasis added.) The trial court also said: "The Defendant is charged with the crime of robbery only as an essential element of felony murder." Therefore, in the context of the instruction given to the jury, the "intent to help commit the crime" and "willful participat[ion] with the intent to make the crime succeed" were presented only with respect to the charge of murder, not robbery. Put another way, the jury was instructed as to the intent requirement of aiding and abetting only with respect to the intent to kill; it was not instructed as to the intent requirement for aiding and abetting a robbery.

Yet, the jury acquitted appellant of premeditated first-degree murder and second-degree murder, thereby necessarily rejecting the proposition that appellant acted with the intent to kill Haiss, either as principal or aider and abettor. But, he was convicted of felony-murder. Even assuming, *arguendo,* that the aiding and abetting instruction could suffice to explain the concept of duress in some cases, in this case we cannot know whether the jury understood that appellant would not have been guilty of felony-murder if he was a coerced participant in the robbery, because the court did not separately instruct the jury on aiding and abetting with respect to robbery.

A Florida case helps to illustrate the difficulty attendant here. In *Wright, supra,* 402 So.2d 493, Wright was convicted of premeditated first-degree murder. Wright and her co-

defendant planned to kill a co-worker, because the co-worker "knew too much" about a "contract" Wright's co-defendant had to kill yet another intended victim. *Id.* at 494–95. Wright and her co-defendant lured their co-worker to an isolated area, where first Wright and then the co-defendant shot the victim. *Id.* at 495. On appeal, Wright contended she did not intend to kill the victim, and that the initial shot she fired at the victim was not the fatal wound. *Id.* at 496. Her argument as to intent was that she acted under duress from her co-defendant. *Id.* at 497. Despite the trial court's refusal to instruct the jury as to duress, the appellate court affirmed. *Id.* The court observed that Wright was guilty as an aider and abettor even if she did not fire the fatal shot, *id.*, and that "duress is not a defense to an intentional homicide." *Id.* at 498. In a footnote, however, the court distinguished the analysis of intent and duress with respect to premeditated murder and felony-murder:

> Wright was charged with . . . first degree murder by premeditated design, which, of course, involves an intent to kill. Where duress is offered as a defense to first degree murder under a felony murder charge, a different question is presented, since duress is a recognized defense to the underlying felony, and the rationale of the rule prohibiting the duress defense in the crime of homicide appears inapplicable. . . . We note, however, that in the case of intentional homicide, duress is no more available to an aider and abettor than it is to the principal, since *the intention of the aider and abettor to participate in the homicide* must be shown.

*Id.* at 498–99 n. 8 (emphasis added; internal citations omitted).

As with the court's putative error in denying the duress instruction on the basis of appellant's conflicting statements in his interrogation, the court did not necessarily commit *reversible* error in denying the duress instruction on the ground that the concept of duress was fairly covered by the aiding and abetting instruction. Again, "a trial court's decision may be correct, although for a different reason than relied on by that court." *Robeson*, 285 Md. at 502, 403 A.2d 1221. The success

of appellant's assignment of error depends on whether, in the light most favorable to him, the factual circumstances indeed gave rise to a duress defense as a matter of law. It is to that determination that we now attend.

The State contends that, even in the light most favorable to appellant, the evidence failed to support three of the required elements of a duress defense: (1) that the threat of death or serious bodily harm was imminent at the time the crime was committed; (2) appellant's fear was reasonable; and (3) appellant had no reasonable opportunity to escape. In response, appellant insists that "[t]he threat in this case may reasonably be inferred from the totality of the circumstances, construed in the light most favorable" to appellant.

We do not discern that appellant was entitled to a duress instruction. To reiterate, MPJI–CR 5:03 indicates that duress consists of four elements:

(1) the defendant actually believed that the duress placed [him] [her] in immediate and impending danger of death or serious bodily harm;

(2) the defendant's belief was reasonable;

(3) the defendant had no reasonable opportunity for escape; and

(4) the defendant committed the crime because of the duress.

Appellant was required to adduce at least "some evidence" as to each element in order to generate the instruction. *See Dykes,* 319 Md. at 216–17, 571 A.2d 1251; *Marquardt,* 164 Md.App. at 131, 882 A.2d 900.

Appellant's statement to Detective Nelson that he would "probably be dead because they killing everybody" plainly did not suffice to meet appellant's *prima facie* burden. As the Court explained in *Martin, supra,* 329 Md. 351, 619 A.2d 992, in the related context of self-defense, the issue is generated "[o]nly if the record reflects, from whatever source, that, *at that time,* the defendant subjectively believed that he or she was in imminent danger of death or great bodily harm...." *Id.* at 363, 619 A.2d 992 (emphasis added). Appel-

lant's statement, made a month after Haiss's murder, during a police interrogation, to the effect that he "probably" would be dead had he not cooperated with Haiss's assailants, says nothing as to whether appellant "actually believed," at the time he knocked on Haiss's door, that he was in danger of death or serious bodily harm. Moreover, appellant's statement that he "probably" would be dead did not address whether he believed that the threatened death or injury was imminent or impending at the time of the offense if he did not cooperate.

■ Similarly, we reject appellant's resort to the after-the-fact threats that S.O. allegedly made against him to ensure his silence after the murder occurred. Appellant suggests that these threats are "circumstantial evidence that indicates that [appellant] may not have voluntarily participated and had done so only under the duress of similar threats." But, under *Martin*, such *post hoc* statements cannot substitute for evidence that appellant was actually under duress at the time of the incident.

■ Appellant's account of S.O.'s statements to him as they drove toward Haiss's house presents a closer issue. In the interrogation, appellant informed Detective Nelson that when he initially told S.O. that he wanted "nothing to do" with S.O.'s plan to rob Haiss, S.O. told him, "man, it's GBA [guilt by association], you get down or you lay down, you gonna be with that old man in the house or you gonna leave out the house with us, which one you wanna do?" In appellant's account, this statement from S.O. led him to cooperate in the robbery by knocking on Haiss's door. Taken in the light most favorable to appellant, this statement could arguably be "some evidence" that S.O. placed appellant in reasonable fear of imminent death or serious bodily harm if he did not cooperate, and that appellant's cooperation in Haiss's robbery was the result of this duress. In light of appellant's account, it could also be inferred that appellant had no reasonable opportunity to escape from the time S.O. made that statement until the point that S.O. and Vel entered Haiss's house, because appel-

lant was under the immediate supervision of S.O. and Vel during that time.[14]

■ Critically, however, even according to the version of the facts most favorable to appellant, he was not under duress *throughout the crime.* According to appellant, his only role was to knock on Haiss's door. At that point, S.O. and Vel entered the house, assaulted Haiss, and left appellant outside, where (depending on which of his accounts to Detective Nelson is to be believed) appellant either ran home or waited until S.O. and Vel emerged. By his own account, the crime was ongoing, and appellant continued to aid and abet it by failing to take any step to stop it.

"A mere change of heart, flight from the crime scene, apprehension by the police, or an uncommunicated decision not to carry out his part of the scheme will not suffice" to allow an aider or abettor to escape liability and withdraw from a crime. LaFave, § 13.3(d), at 691 (4th ed.2003) (footnotes omitted). Rather, "it is necessary that he (1) repudiate his prior aid, or (2) do all that is possible to countermand his prior aid or counsel, and (3) do so before the chain of events has become unstoppable." *Id.* (footnotes omitted). *Accord Sheppard v. State,* 312 Md. 118, 124, 538 A.2d 773 (1988), *overruled on other grounds by State v. Hawkins,* 326 Md. 270, 284 &

---

**14.** We observe that the form of S.O.'s statement to appellant that "you gonna be with that old man in the house or you gonna leave out the house with us," if it is understood as a threat, significantly undercuts a duress defense because it equivocates between the harm that S.O. intended would come to Haiss, and the threatened harm that S.O. would inflict on appellant if he did not cooperate. If the statement is understood as a threat to appellant that he would suffer death or serious bodily injury if he did not cooperate, it must also be understood as a statement that S.O. intended to kill or seriously injure Haiss. If appellant participated in Haiss's robbery knowing that his co-felons intended to kill Haiss, the defense of duress would be unavailable. Nevertheless, it is possible to understand the statement as a threat that Haiss would be seriously injured, and that appellant would be seriously injured as well if he did not cooperate. Thus, while the form of S.O.'s statement undercuts a duress defense, it does not necessarily negate the defense.

293–94, 604 A.2d 489 (1992). Appellant did none of these things.

Stated another way, even if appellant was under duress until the point that S.O. and Vel entered Haiss's house, once they did so there was no imminent or impending threat to appellant. S.O. and Vel left him outside, free to flee and to call the police. If appellant had done so, he might have cut short the robbery and averted Haiss's senseless murder.

Several other states require, as an explicit element of a duress defense, that the defendant's fear of imminent death or serious injury " 'must have continued throughout the commission of the crime....' " *State v. Caine*, 746 N.W.2d 339, 356 (Minn.2008) (citation omitted). *See also, e.g., Williams v. State*, 937 So.2d 771, 772 (Fla.App.2006) (an element of duress is that "the defendant ceased the criminal conduct as soon as the necessity or apparent necessity for it ended"); *State v. Getsy*, 84 Ohio St.3d 180, 702 N.E.2d 866, 885 (1998) ("The force used to compel the actor's conduct must remain constant, controlling the will of the unwilling actor during the entire time he commits the act ....."), *cert. denied*, 527 U.S. 1042, 119 S.Ct. 2407, 144 L.Ed.2d 805 (1999); *State v. Davis*, 256 Kan. 1, 883 P.2d 735, 740 (1994) (for duress defense to apply "the compulsion must be continuous"). To date, Maryland courts have not addressed the issue.

The facts of this case lead us to conclude that continuity ought to be an element of the duress defense. As Professor LaFave states: "The rationale of the defense of duress is that the defendant ought to be excused when he 'is the victim of a threat that a person of reasonable moral strength could not fairly be expected to resist.' " LaFave, § 9.7, at 491 (4th ed.2003). Although a person may be justified in participating in a felony under the threat of death or serious physical harm, the rationale for the defense of duress does not apply when the threat ceases but the felony continues. In such a situation, "person[s] of reasonable moral strength" would and should take every available opportunity to stop the felony that was aided by their coerced participation. Perhaps because of

appellant's failure to do so, Hermann Haiss is dead. Appellant is not entitled to a duress defense.

## III.

As an additional ground for reversal of his conviction for felony-murder, appellant contends that his indictment was jurisdictionally defective because it did not charge felony-murder or the predicate felony of robbery. The indictment issued on January 12, 2006 stated:

> The grand jurors of the State of Maryland, for the body of Prince George's County, on their oath do present that **Nathaniel Paul McMillan** on or about the 16th day of [November] [15] Two Thousand and Five, in Prince George's County, Maryland feloniously, willfully and with deliberately premeditated malice killed and murdered Hermann Sigman Haiss, against the peace, government and dignity of the State. **(MURDER).**

In appellant's view, by charging that he killed Haiss "feloniously, willfully *and with deliberately premeditated malice*" (appellant's emphasis), the indictment exclusively charged first-degree premeditated murder, of which appellant was acquitted by special verdict. Because the indictment did not charge felony-murder, appellant maintains that the court lacked jurisdiction to try him for that crime. According to appellant, he was convicted "of a crime, felony-murder, for which he was not indicted and over which it consequently lacked jurisdiction. Mr. McMillan's sentence is therefore illegal, and this Court should vacate both his conviction and sentence despite his attorney's failure to object at trial."

The language of appellant's indictment was drawn from C.L. § 2–208, which provides a statutory "short form" for an indictment for murder or manslaughter. C.L. § 2–208 states:

---

**15.** The month was inadvertently omitted from the original indictment. By order of the court entered February 28, 2006, issued pursuant to the State's motion, and with appellant's consent, the indictment was amended to add the month.

§ 2-208. **Charging document.**

(a) *Contents.*—An indictment for murder or manslaughter is sufficient if it substantially states:

"(name of defendant) on (date) in (county) feloniously (willfully and with deliberately premeditated malice) killed (and murdered) (name of victim) against the peace, government, and dignity of the State."

(b) *Manner or means of death.*—An indictment for murder or manslaughter, or for being an accessory to murder or manslaughter, need not set forth the manner or means of death.

Appellant acknowledges that in both *Ross v. State, supra,* 308 Md. 337, 519 A.2d 735 (1987), and *Wood v. State,* 191 Md. 658, 62 A.2d 576 (1948), the Court of Appeals upheld convictions for felony-murder on first-degree murder indictments that used the statutory short-form language and did not specifically allege felony-murder. He insists, however, that neither *Ross* nor *Wood* forecloses his argument, because, according to appellant, the Court of Appeals did not directly address in either decision the argument he makes.

Further, appellant concedes that, under *Ross* and *Wood,* "a general indictment for first-degree common-law murder, alleging that the defendant killed someone with a malevolent state of mind and without justification, would be constitutionally adequate to allow him to be prosecuted under any theory of first-degree murder." But, he argues that "[t]he *Ross* Court never stated ... that the State may affirmatively *lie* to the defendant about the nature of the charges against him by indicting him specifically for premeditated murder and then also proceeding under a felony murder theory." He posits:

Allowing the State to remain silent about its specific theory of murder does not permit the State to go a step further and deceive the defendant. If the State chooses to specify a particular theory of the case by indicting a defendant specifically for premeditated murder and alleging that he acted with premeditation, then a court may not try the defendant for felony murder also.

Moreover, appellant argues that, even if *Ross* and *Wood* would otherwise foreclose his argument, their footing in Maryland constitutional law should be reevaluated in light of the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).[16] Although he concedes that federal jurisprudence on the sufficiency of indictments does not directly control in state prosecutions, appellant asserts that, as we held in *Bridges v. State*, 116 Md.App. 113, 126, 695 A.2d 609 (1997), "[t]he list of rights protected by Article 21 of the Maryland Declaration of Rights and the Federal Sixth Amendment are identical. . . . Generally speaking, those entire respective packages of rights should be construed *in pari materia.*"

Quoting *Whittlesey v. State*, 326 Md. 502, 526, 606 A.2d 225, *cert. denied*, 506 U.S. 894, 113 S.Ct. 269, 121 L.Ed.2d 198 (1992), appellant notes that "Maryland courts repeatedly have recognized that '[t]he underlying felony is an essential ingredient of felony murder.'" Appellant maintains that the indictment did not set forth any of the elements of the felony he was accused of intending to commit. He observes: "[I]t does not even alert the defendant that the State intends to show that he intended or attempted to commit some other unspecified offense." Further, he asserts:

> Particularly under the *Apprendi* standard, this Court presumably would not hesitate to invalidate an indictment that alleged only that the defendant committed the offense of "Felony," where that term could refer to arson, burglary, carjacking, escape, kidnapping, mayhem, rape, robbery, sexual offense, sodomy, or crimes involving destructive devices. Such a document would not give the defendant, the court, or

---

16. Appellant suggests that *Apprendi* stands for the proposition that, " 'under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment,' " all the elements of an offense " '*must be charged in an indictment*, submitted to a jury, and proven beyond a reasonable doubt.' " *Id.* at 476, 120 S.Ct. 2348 (quoting *Jones v. United States*, 526 U.S. 227, 243 n. 6, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999)) (appellant's emphasis). As we shall discuss, this is not an accurate account of *Apprendi's* holding.

the public any notice as to the actual nature of the pending charges, and does not identify the elements that the State will attempt to prove at trial.

The State counters that appellant's argument is not preserved. It points out that appellant does not contest the indictment's sufficiency to charge premeditated murder, and observes that appellant was tried (although acquitted) on that offense. Therefore, the State contends that the locus of any putative error is not in the indictment, but in the court's instruction to the jury to consider felony-murder, its submission of a verdict sheet including felony-murder, or its acceptance of the jury's guilty verdict on felony-murder, all of which occurred without any objection from appellant.

Alternatively, the State posits that appellant's argument fails on the merits. It contends:

[A] simple comparison of the indictment returned against McMillan with the form set out in [C.L. § ] 2–208, demonstrates that the indictment properly followed the statutory short form for murder. The State was not required to set out the "manner and means" by which the murder was committed. The short form indictment did, in fact, properly charge McMillan with first degree murder, and one of its forms is first degree felony murder.

Citing *Wood, supra,* 191 Md. 658, 62 A.2d 576, as well as *Dishman, supra,* 352 Md. 279, 721 A.2d 699, the State argues that "the statutory short form indictment is sufficient to charge first degree premeditated murder, first degree felony murder, second degree murder, and manslaughter." In its view, "the language of the particular type of first degree murder sought to be proved need not be inserted in a given case...."

Conceding that he did not raise this purported defect at trial, appellant cites *State v. Chaney,* 304 Md. 21, 25, 497 A.2d 152 (1985), *cert. denied,* 474 U.S. 1067, 106 S.Ct. 824, 88 L.Ed.2d 796 (1986), for the proposition that "a claim that an indictment fails to charge or characterize a crime is jurisdictional and may be raised at any time." Appellant invokes the

fundamental principle that "'a court is without power to render a verdict or impose a sentence under a charging document which does not charge an offense within its jurisdiction prescribed by common law or by statute.'" *Edmund v. State*, 398 Md. 562, 570, 921 A.2d 264 (2007) (citation omitted).

 Appellant is correct that "jurisdictional challenges may be made at any time." *Denicolis v. State*, 378 Md. 646, 661, 837 A.2d 944 (2003). Under Maryland Rule 4–252(d) (2008), "[a] motion asserting failure of the charging document to show jurisdiction in the court or to charge an offense may be raised and determined at any time." *See also Williams v. State*, 302 Md. 787, 792, 490 A.2d 1277 (1985) ("A claim that a charging document fails to charge or characterize an offense is jurisdictional and may be raised, as here, for the first time on appeal."). But, not every defect in a charging document is jurisdictional. The flaw in appellant's argument is that he conflates the jurisdictional and notice purposes served by an indictment. Despite appellant's attempt to cast the purported defects in his indictment as jurisdictional, the alleged defects pertain only to notice.

Appellant's claim of a jurisdictional defect is grounded in his contention that "the only offense for which he was indicted in this case was premeditated murder." His assertion rests on a misunderstanding of the short-form indictment language.

 As we have seen, "[m]urder is the killing of one human being by another with the requisite malevolent state of mind and without justification, excuse, or mitigation." *Ross*, 308 Md. at 340, 519 A.2d 735. The *Ross* Court also observed: "Courts and commentators have used the term 'malice' as a type of legal shorthand to embrace the elements of 1) the presence of the required malevolent state of mind, and 2) the absence of legally adequate justification, excuse, or circumstances of mitigation." *Id.* at 340 n. 1, 519 A.2d 735. *Ross* made clear that "a conviction of first degree murder may be proved [in various ways,] *either* by showing deliberation, wilfullness and premeditation (premeditated murder), *or* by showing a homicide committed in the perpetration, or attempt-

ed perpetration, of one of the enumerated felonies (felony murder). *There is but one offense—murder in the first degree—but that offense may be committed in more than one way." Id.* at 341–42 (emphasis added).

Notably, C.L. § 2–208 specifically provides that the short-form indictment is "sufficient" to charge "murder or manslaughter."[17] However, the short form "is not the exclusive mode of pleading.... This form 'may, but need not, be used in lieu of the common law forms.'" *Edmund,* 398 Md. at 572, 921 A.2d 264 (citation omitted). *See also In re Roneika S.,* 173 Md.App. 577, 591–93, 920 A.2d 496 (2007) (discussing constitutional sufficiency of notice provided by indictment using statutory short form). If an indictment or other charging document "sufficiently characterize[s]" a crime, it is not jurisdictionally defective, even if the charging document does not "aver [the] essential elements" of the crime. *Williams,* 302 Md. at 793, 490 A.2d 1277. So long as the crime charged is plain from the "common parlance" of the charging document, the court is "invested ... with jurisdiction to try the offense." *Id.*

In *Wood v. State, supra,* 191 Md. 658, 62 A.2d 576, as in this case, a criminal defendant who was convicted of murder on a felony-murder theory argued that his indictment, which "followed precisely the language set out" in the statutory short form, *id.* at 663, 62 A.2d 576, "charge[d] only premeditated murder, as distinguished from murder committed in the perpetration of a robbery...." *Id.* at 665, 62 A.2d 576. The *Wood* Court rejected the argument,[18] stating:

---

**17.** A short form of indictment for homicides was first enacted by Chapter 248 of the Acts of 1906. *Edmund,* 398 Md. at 572, 921 A.2d 264.

**18.** When *Wood* was decided, the short form was codified, with slightly different language, at Md.Code Ann., Art. 27, § 665. *Wood,* 191 Md. at 663, 62 A.2d 576. The *Wood* Court did not articulate whether the defendant's claim was predicated on jurisdictional or notice grounds. That distinction was not dispositive in *Wood,* however, because the defendant in that case "properly preserved" his objections "for consideration by [the] [C]ourt." *Id.*

It is suggested ... that the parentheses around the words: "(wilfully and of deliberately premeditated malice aforethought)" and the words "(and murder)", in [the short form], are merely illustrative, and contemplate that the language of the particular type of first degree murder, sought to be proved, should be inserted in a given case. The section, however, covers "any indictment for murder or manslaughter, or for being an accessory thereto," and we think the correct explanation of the parentheses is that they were intended to indicate how the "formula" should be modified if the indictment is designed to cover murder in the first or second degrees [on the one hand], or manslaughter [on the other]. *We do not construe [the statute] to require the fact of robbery to be incorporated in an indictment as part of the crime charged* .... At the time [the short form] was adopted, no such particularity was required. Since the common law forms are still permissible the statutory form could hardly be construed to impose additional requirements in this respect.

*Id.* at 667, 62 A.2d 576 (internal citations omitted; emphasis added).

*Dishman v. State, supra,* 352 Md. 279, 721 A.2d 699 (1998), upon which the State relies, also provides guidance. In *Dishman,* the Court considered whether the statutory short-form indictment provided by C.L. § 2–208 properly charged manslaughter, when it included the optional parenthetical language indicting the defendant for premeditated murder.[19] The Court observed that the purpose of the short-form indictment was to " 'escape the excessive formalism of the common law, which formerly made the conviction or acquittal of one charged with crime so often turn upon some technical quibble rather than upon the guilt or innocence of the accused.' " *Id.* at 287, 721 A.2d 699 (citation omitted). Moreover, it " 'looked with favor upon the general trend of relaxing the formal requirements of

---

**19.** At the time *Dishman* was decided, the provisions of the present C.L. § 2–208 were codified at Md.Code Ann., Art. 27, § 616. *Dishman,* 352 Md. at 283, 721 A.2d 699.

indictments to avoid the prolix and often overly technical rules of common law pleading in favor of the shorter and simpler forms.'" *Id.* at 289, 721 A.2d 699 (quoting *Ross,* 308 Md. at 346, 519 A.2d 735).

The *Dishman* Court cited several cases, including *Wood,* in which it had upheld convictions of manslaughter or non-premeditated murder based on indictments that conformed to the short form, 352 Md. at 287–89, 721 A.2d 699, and said: "While some of these cases refer to second degree murder and manslaughter as lesser offenses of first degree murder, the language makes clear that an indictment under [the short form] alleging first degree murder also *charges* second degree murder and manslaughter." *Id.* at 289–90, 721 A.2d 699 (emphasis in original). Declaring that any "ambiguity should [be] laid to rest," *id.* at 288, 721 A.2d 699, the Court stated: "'It is well settled that under an indictment pursuant to the statutory formula, *even though it spells out murder in the first degree,* the accused may be convicted of murder in the first degree, of murder in the second degree, or of manslaughter.'" *Id.* at 289, 721 A.2d 699 (citation omitted).

*State v. Chaney, supra,* 304 Md. 21, 497 A.2d 152, illustrates the "flexible interpretation" articulated in *Dishman.* In *Chaney,* the Court upheld a first-degree murder conviction in which the indictment "charged only that Chaney 'did wilfully and deliberately, with premeditation kill and slay' the named victim in violation of the common law and contrary to specified statutes punishing various forms of first degree murder." *Id.* at 26, 497 A.2d 152 (quoting indictment). The Court observed that "[m]alice is, of course, an essential ingredient of murder; its presence, either directly or inferentially, must be established to sustain a conviction for the offense." *Id.* But, the Court emphasized, "in ascertaining the existence of jurisdiction in the circuit court, we consider the indictment in its entirety." *Id.* at 27, 497 A.2d 152. It also said: "The indictment in this case does not contain all the language set forth in [the statutory short form] for charging murder; the words 'felonious,' 'malice aforethought,' and 'murder' are missing." *Id.* at 26, 497 A.2d 152. Nevertheless, the Court concluded

that the indictment was not jurisdictionally defective because, "[i]mplicit in [its] language is that the killing was unlawful," and the indictment specifically cited the first-degree murder statute. *Id.*

As appellant notes, Maryland courts have occasionally observed that "premeditated murder and felony murder must be treated as separate offenses, with distinct elements, *for some purposes.*" *Hagans v. State,* 316 Md. 429, 443, 559 A.2d 792 (1989) (emphasis added). *See also Huffington v. State,* 302 Md. 184, 188, 486 A.2d 200 (1983); *Stovall v. State,* 144 Md.App. 711, 726, 800 A.2d 31, *cert. denied,* 371 Md. 71, 806 A.2d 681 (2002). However, the cases cited by appellant concern the question of whether one offense is the same as another for purposes of double jeopardy; they do not speak to the jurisdictional sufficiency of an indictment.

Notably, the indictment here alleged that appellant "feloniously, willfully and with . . . malice killed and murdered Hermann Sigman Haiss." As noted, the intentional commission or attempt of an underlying felony is " 'malice by definition.' " *Allen, supra,* 387 Md. at 403, 875 A.2d 724 (citation omitted). We have little difficulty concluding that appellant's indictment, which conformed in every relevant way with the statutory form specified in C.L. § 2–208, invested the circuit court with jurisdiction to try him for murder of any variety—including felony-murder.

Contrary to appellant's position, the State's decision not to charge appellant with the underlying robbery did not deprive the court of jurisdiction to try him for felony-murder. In *Adams v. State,* 8 Md.App. 684, 262 A.2d 69, *cert. denied,* 258 Md. 725, *cert. denied,* 400 U.S. 928, 91 S.Ct. 193, 27 L.Ed.2d 188 (1970), the Court rejected the argument that the underlying felony must be charged to vest the court with jurisdiction to try a defendant for first-degree felony-murder. *Id.* at 689–90, 262 A.2d 69.

In that case, a juvenile was charged with first-degree murder in the circuit court on a theory of felony-murder, under the then-applicable Public Local Laws of Baltimore City, *see*

*id.* at 690, 262 A.2d 69, despite the fact that "there was no waiver by the juvenile court of its jurisdiction over the underlying felony of armed robbery." *Id.* at 689–90, 262 A.2d 69. We said, *id.* at 691, 262 A.2d 69:

> [T]he fact that a murder occurred during the perpetration of one of the felonies enumerated in [the statute] determines only the degree of the crime and the penalty to be imposed. Proof of facts showing that a robbery was committed is only one of the elements of proof necessary to establish the crime of first degree murder. In effect, there is no difference between proving the felony and proving willfulness, deliberateness and premeditation in a first degree murder case under [the statute].... There is no necessity for the State to indict and convict the accused of the underlying felony of robbery to sustain a conviction of murder in the first degree.

Several of appellant's contentions are actually grounded in the notice purposes served by an indictment, as opposed to jurisdiction. Article 21 of the Maryland Declaration of Rights speaks to notice. It guarantees "[t]hat in all criminal prosecutions, every man hath a right to be informed of the accusations against him...." But, Article 21's command is not concerned with jurisdiction.

A charging document may be attacked on notice grounds, "for it may ... be deficient in failing to fully inform the accused of the specific conduct with which he is charged...." *Williams*, 302 Md. at 793, 490 A.2d 1277. Of import here, because, a "defendant's Federal and State Constitutional rights to fair notice" are not jurisdictional impediments, a notice claim may be waived by failure to file a timely motion under Rule 4-252. *Denicolis*, 378 Md. at 659–62, 837 A.2d 944. Under Maryland Rule 4-252(a)(2), "[a] defect in the charging document other than its failure to show jurisdiction in the court or its failure to charge an offense" is waived unless filed within 30 days of the first appearance of the defendant or his counsel. What the Court said in *Denicolis,*

378 Md. at 661–62, 837 A.2d 944 (citations and footnote omitted), is apt:

> The argument made by petitioner in this appeal does not directly charge, much less establish, any . . . jurisdictional defect . . . but rather complains about the confusion that ensued from the failure of the criminal information to identify the intended victim(s). The gravamen of . . . the current complaint seems to be the lack of fair notice of the nature of the charges. Unquestionably, a charging document that fails to give adequate notice of the charges is deficient and subject to dismissal. That kind of deficiency is the proper subject of a motion under Rule 4–252(a). It does not necessarily translate into the failure to show jurisdiction or to allege a criminal offense, however.

We need not decide whether the indictment gave appellant constitutionally adequate notice that he was facing a charge of felony-murder, because appellant did not object below on notice grounds. "Where the claimed defect is not jurisdictional, it must be seasonably raised before the trial court or it is waived." *Williams*, 302 Md. at 792, 490 A.2d 1277.

Even if a notice argument were preserved, its merit is doubtful. We explain.

In *Ross*, *supra*, 308 Md. 337, 519 A.2d 735, the Court rejected a challenge, on notice grounds, to a conviction of first-degree felony-murder on an indictment that alleged premeditated first-degree murder using the statutory short form. *Id.* at 339, 519 A.2d 735. In that case, the defendant "moved for a judgment of acquittal on the murder count on the grounds that the evidence was legally insufficient to show . . . premeditated murder, and that he could not be convicted on a theory of felony murder because he was charged only with premeditated murder." *Id.* Morever, he "interposed a timely objection" to a jury instruction on a theory of felony-murder. *Id.* In rejecting Ross's argument, the Court said, *id.* at 345, 519 A.2d 735 (emphasis added):

A defendant charged in the statutory language employed in this case is clearly apprised that he is being charged with the crime of murder and that he may be convicted of murder in either degree, or manslaughter. That defendant is also told when and where the homicide occurred, and the identity of the victim. *He is not told whether the State will proceed upon one or another, or upon several theories concerning the particular malevolent state of mind alleged to have been present, but neither is he entitled to this information as a matter of constitutional due process.*

The *Ross* Court also addressed the argument that "the error is one of commission as well as omission because the indictment specifically charges the premeditated species of murder." *Id.* at 342, 519 A.2d 735. The Court said, *id.* at 347, 519 A.2d 735:

> In this case, where there can be no doubt that the accused was aware that he was charged with murder in the first degree, and where it has been the clear and unchanged law of this State for more than 80 years that a charge of murder in this form may be made out by proof of premeditated murder or proof of felony murder, it cannot be said that Ross was misled....

*Ross* is distinguishable, however. Unlike appellant, Ross was charged with the underlying felony of robbery, which led to his felony-murder conviction. *Id.* at 339, 519 A.2d 735. Arguably, he had some notice that he faced liability for felony-murder.

Finally, although we need not address further the substance of appellant's unpreserved argument, an observation concerning *Apprendi* is in order. Appellant cites *Apprendi* for the proposition that all the elements of an offense must be charged in an indictment. *Apprendi* does not stand for that proposition, however.

*Apprendi* involved a challenge to New Jersey's "hate crime" law, which provided, when a defendant was convicted of an underlying crime, for an " 'extended term' of imprisonment if the trial judge [found], by a preponderance of the evidence,

that '[t]he defendant in committing the crime acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity.' " *Apprendi*, 530 U.S. at 468–69, 120 S.Ct. 2348 (quoting statute). The Court invalidated the statute, *id.* at 491–92, 120 S.Ct. 2348, concluding that the Due Process Clause of the Fourteenth Amendment requires that, in state prosecutions, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490, 120 S.Ct. 2348.

The *Apprendi* Court made clear that its holding did not address indictments in state courts. *Apprendi*, 530 U.S. at 477 n. 3, 120 S.Ct. 2348. The statements regarding indictments in *Apprendi*, on which appellant relies, are quotations from *Jones v. United States*, 526 U.S. 227, 243 n. 6, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), which was a federal prosecution. After *Apprendi*, in *Evans v. State*, 389 Md. 456, 886 A.2d 562 (2005), *cert. denied*, 546 U.S. 1219, 126 S.Ct. 1442, 164 L.Ed.2d 141 (2006), the Court rejected a contention that a capital defendant's Fifth and Sixth Amendment rights were violated when he was sentenced to death after being indicted for murder via a statutory short-form indictment under C.L. § 2–208, because it did not contain the "aggravating factors" supporting his sentence. *Id.* at 472–80, 886 A.2d 562. Addressing the defendant's reliance on *Apprendi*, the *Evans* Court said, *id.* at 474–75, 886 A.2d 562:

> The simple answer is that, although the general requisites implicit in the due process clause of the Fifth Amendment are applicable to the States through the comparable clause of the Fourteenth Amendment, any requirement implicit in the Fifth or Sixth Amendment that elements of a criminal offense be alleged in a presentment or indictment returned by a Grand Jury has been found inapplicable to State prosecutions.

* * *

The *Apprendi* Court made expressly clear that it was not addressing that issue.

*See also Baker v. State*, 367 Md. 648, 683, 790 A.2d 629, *cert. denied*, 535 U.S. 1050, 122 S.Ct. 1814, 152 L.Ed.2d 817 (2002) (rejecting a challenge to a capital murder indictment on the grounds that it did not allege the death-qualifying aggravating factors that the State intended to prove).

Neither *Evans* nor *Baker* directly addressed the question of whether Article 21 requires that all elements of a crime must be articulated in a charging document. We have no occasion to pursue the question further, as appellant did not preserve the issue.

## IV.

Finally, appellant contends that the trial judge's jury instruction on reasonable doubt violated the Court of Appeals's command in *Ruffin v. State*, 394 Md. 355, 906 A.2d 360 (2006), that trial courts "must closely adhere to the approved pattern instruction on the presumption of innocence and reasonable doubt, MPJI–CR 2:02." *Id.* at 357, 906 A.2d 360. Specifically, appellant points to the following sentence from the jury instructions: "It [i.e., reasonable doubt] is not a fanciful doubt, a whimsical doubt, or a capricious doubt."

In *Ruffin*, the trial judge deviated from the pattern instruction in several ways, among them the inclusion of the "fanciful ... whimsical ... capricious" sentence at issue here. *Id.* at 360–62, 906 A.2d 360.[20] However, in 1999 the Maryland State

---

**20.** In *Ruffin*, the trial court allegedly erred in three other ways: (1) by omitting the last sentence of the pattern instruction, which reads, "However, if you are not satisfied of the defendant's guilt to that extent, then reasonable doubt exists and the defendant must be found not guilty"; (2) by informing the jury that the presumption of innocence remains *"until* you believe it has been overcome," rather using the pattern instruction's formulation of "unless"; and (3) by departing from the pattern instruction to remark that the defendant was entitled to a presumption of innocence, "just as every defendant who is tried in

Bar Association's Standing Committee on Pattern Jury Instructions deleted that sentence from Maryland's pattern instruction on reasonable doubt, "after receiving numerous complaints that the language was confusing to jurors." *Id.* at 361, 906 A.2d 360. *See also* MPJI–CR 2:02 at 18.1 (1999 Supp.) (comment to instruction explaining: "In response to concerns raised by numerous judges regarding confusion caused by this language, the committee removed this sentence from the instruction.").

The *Ruffin* Court did not directly address the propriety of the "fanciful ... whimsical ... capricious" sentence, or the other allegedly erroneous instructions propounded to the jury in that case. Rather, the Court declined to "rest [its] decision upon the particular instruction given by the trial court." 394 Md. at 363, 906 A.2d 360. Instead, the Court reevaluated its prior precedent concerning instructions on reasonable doubt and the presumption of innocence, *id.* at 371–72, 906 A.2d 360, and determined: "Uniformity in defining those terms for the jury, by giving the pattern jury instruction, ensures that all defendants will equally receive an appropriate definition. . . ." *Id.* at 373, 906 A.2d 360. Accordingly, the Court held that "in every criminal jury trial, the trial court is required to [give an] instruct[ion to] the jury on the presumption of innocence and the reasonable doubt standard of proof *which closely adheres to MPJI–CR 2:02. Deviations in substance will not be tolerated.*" *Id.* (Emphasis added.) Notably, the Court explained that its holding represented "a change in a Maryland common law principle and not an overruling of prior cases on the ground that they were erroneously decided." *Id.* at 373 n. 7, 906 A.2d 360. Therefore, the Court instructed that its holding "shall be applied only prospectively. In other words, today's holding 'applies to the instant case[ ] . . . and to all [criminal] trials commencing and trials in progress on or after the date this opinion is filed.'" *Id.* (citation omitted).

---

every courtroom in the United States of America in a criminal charge is." *Id.* at 360–61, 906 A.2d 360.

Significantly, the Court's opinion in *Ruffin* was filed on August 31, 2006, and a corrected opinion was filed on September 7, 2006. The mandate was issued on October 2, 2006. The trial in the case *sub judice* began one day later, on October 3, 2006. Thus, the rule announced in *Ruffin* was applicable to this case, because the trial " 'commenc[ed] ... on or after the date [the] opinion [in *Ruffin* was] filed,' " i.e., September 7, 2006. *Ruffin*, 394 Md. at 373 n. 7, 906 A.2d 360 (citation omitted).

Appellant concedes that his trial counsel did not object to the trial court's deviation from the pattern instruction. But, he argues that "this Court nevertheless should exercise its discretion to recognize this plain error ... and reverse his conviction." We decline to do so.

Ordinarily, we will not undertake appellate review of a defect in jury instructions unless a timely objection is made to the instruction. *See* Maryland Rule 4–325(e).[21] In *Ayers v. State*, 335 Md. 602, 627–28, 645 A.2d 22 (1994), *cert. denied*, 513 U.S. 1130, 115 S.Ct. 942, 130 L.Ed.2d 886 (1995), the Court said: "[A] party who fails to object to a jury instruction at trial may not later raise the issue...." Indeed, the Court "has been ... rigorous" in "adhering steadfastly to the preservation requirement." *Morris v. State*, 153 Md.App. 480, 508, 837 A.2d 248 (2003), *cert. denied*, 380 Md. 618, 846 A.2d 402 (2004). *See, e.g., Conyers v. State*, 354 Md. 132, 166–67, 729 A.2d 910 (noting that defendant's complaint about jury instruction was not preserved because of failure to object), *cert. denied*, 528 U.S. 910, 120 S.Ct. 258, 145 L.Ed.2d 216 (1999); *State v. Rose*, 345 Md. 238, 245, 691 A.2d 1314 (1997) ("The

---

**21.** Maryland Rule 4–325(e) provides:

(e) *Objection.* No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection. Upon request of any party, the court shall receive objections out of the hearing of the jury. An appellate court, on its own initiative or on the suggestion of a party, may however take cognizance of any plain error in the instructions, material to the rights of the defendant, despite a failure to object.

general rule is that the failure to object to a jury instruction at trial results in a waiver of any defects in the instruction, and normally precludes further review of any claim of error relating to the instruction."); *Walker v. State,* 343 Md. 629, 645, 684 A.2d 429 (1996) ("Maryland Rule 4–325(e), as well as a multitude of cases in this Court, make it clear that the failure to object to a jury instruction ordinarily constitutes a waiver of any later claim that the instruction was erroneous"); *Bowman v. State,* 337 Md. 65, 67, 650 A.2d 954 (1994) ("[R]eview of a jury instruction will not ordinarily be permitted unless the appellant has objected seasonably. . . .").

▮▮▮ The policy behind the preservation rule is clear. The trial court cannot correct errors of which it is not informed. Only if a party takes exception to an error in the jury instruction does the court have the opportunity to correct it. *Johnson v. State,* 310 Md. 681, 686, 531 A.2d 675 (1987). Indeed, one of the "key virtues of the preservation requirement" is that it enables the trial court "to correct an easily correctable mistake." *Morris,* 153 Md.App. at 509, 837 A.2d 248; *see Bowman,* 337 Md. at 69, 650 A.2d 954; *Thomas v. State,* 143 Md.App. 97, 116, 792 A.2d 368, *cert. denied,* 369 Md. 573, 801 A.2d 1033 (2002). Put another way, considerations of fairness and judicial efficiency generally require that all challenges that a party wishes to make to a trial court's ruling, action, or conduct "be presented in the first instance to the trial court so that (1) a proper record can be made with respect to the challenge, and (2) the other parties and the trial judge are given an opportunity to consider and respond to the challenge." *Chaney v. State,* 397 Md. 460, 468, 918 A.2d 506 (2007).

▮▮▮ To be sure, when a defendant fails to object, an appellate court possesses "plenary discretion to notice plain error material to the rights of a defendant, even if the matter was not raised in the trial court." *Danna v. State,* 91 Md.App. 443, 450, 605 A.2d 150, *cert. denied,* 327 Md. 627, 612 A.2d 257 (1992). But, "there are some limitations on the affirmative act of noticing error. 1) There must be error. 2) It must be

plain. 3) It must be material." *Morris*, 153 Md.App. at 507 n. 1, 837 A.2d 248 (internal citations and quotations omitted). *See also Jones–Harris v. State*, 179 Md.App. 72, 96–97, 943 A.2d 1272, *cert. denied*, 405 Md. 64, 949 A.2d 652 (2008); *Stockton v. State*, 107 Md.App. 395, 398, 668 A.2d 936 (1995), *cert. denied*, 342 Md. 116, 673 A.2d 707 (1996).

An appellate court's discretion to notice plain error is properly invoked only when the circumstances are "compelling, extraordinary, exceptional or fundamental to assure the defendant a fair trial." *State v. Hutchinson*, 287 Md. 198, 203, 411 A.2d 1035 (1980). *See Walker, supra*, 343 Md. at 649, 684 A.2d 429. Several factors are pertinent to whether an appellate court should exercise its discretion to review plain error. These factors include the opportunity to use an unpreserved contention as a vehicle for illuminating an area of law; the egregiousness of the trial court's error; the impact of the error on the defendant; and the degree of lawyerly diligence or dereliction. *Morris*, 153 Md.App. at 518–24, 837 A.2d 248. *See also Austin v. State*, 90 Md.App. 254, 267–72, 600 A.2d 1142 (1992). However, we need not provide "justification [ ] or explanation" when we decline to take cognizance of plain error. *Morris*, 153 Md.App. at 507, 837 A.2d 248.

None of the factors identified above moves us to exercise our discretion in this case. In *Morris*, prior to embarking on an illuminating seventeen-page exegesis on the topic of plain error review, 153 Md.App. at 507–24, 837 A.2d 248, Judge Moylan, writing for this Court, declined to take cognizance of plain error where a trial judge made an inadvertent slip of the tongue and had told the jury, without objection, that "the State is not required to prove guilt beyond all reasonable doubt." *Id.* at 506, 837 A.2d 248 (emphasis omitted). Although an appellate court may exercise its discretion to overlook non-preservation "simply to seize the occasion as a vehicle to communicate a desired message to bench and bar that might otherwise go unsent," *Stockton*, 107 Md.App. at 396–97, 668 A.2d 936, *Ruffin* clarified the law on the reason-

able doubt instruction. Therefore, this case presents no need for us to revisit the issue.

In any event, the trial court's use of the phraseology at issue was not an egregious error. Although appellant contends that "the trial court's reasonable doubt instruction constitutes plain error because it clearly and indisputably violates *Ruffin* by materially deviating from Pattern Instruction 2:02," the *Ruffin* Court declined to analyze the "fanciful ... whimsical ... capricious" sentence. Therefore, it did not hold that such phraseology alone constitutes a "[d]eviation[ ] in *substance* " from the approved text. *Ruffin*, 394 Md. at 373, 906 A.2d 360 (emphasis added).

Moreover, while the trial court's instruction deviated from the revised pattern instruction, it conformed to an earlier version that had been in use for many years. The sentence of which appellant complains was a part of the sanctioned text of the pattern instruction until 1999, and countless juries have convicted criminal defendants after being so instructed. Although the sentence was removed from the pattern instruction due to concern that it was confusing to juries, the Court made clear that its opinion in *Ruffin* was prospective, signaling that the revised text constituted an improvement. Notably, the Court did not determine that the sentence misstated the law.

What we said in *Stockton*, 107 Md.App. at 397–98, 668 A.2d 936, is pertinent here:

> The appellant offers us no good reason why defense counsel should not have been expected to be just as current on the Maryland case law as defense counsel now suggests the trial judge should have been. It is our reliance on the professional expertise of lawyers, after all, that causes us to make such a fetish out of a defendant's right to the assistance of counsel. The defense attorney should be far better prepared on a case than the trial judge, who frequently sees it fresh on the morning of trial. With criminal defense attorneys, moreover, frequently being specialists in their field while trial judges are required to be generalists, one could argue that there is an even greater demand that counsel be

alert to the latest nuances and oscillations in the law. There certainly should not be less demand.

Appellant cites *Squire v. State,* 280 Md. 132, 135, 368 A.2d 1019 (1975), as an example of a case in which Maryland courts have overlooked an attorney's failure to raise an argument at trial when it is based on a new principle of law contained in a case decided shortly before trial, and argues that we should notice plain error here because "[a]ttorneys should not be charged with knowledge of cases before they even are binding and while they are subject to reconsideration," nor should appellant be "penalize[d] ... for his attorney's lack of such knowledge." We do not see *Squire* as analogous to this situation. The trial judge in *Squire* instructed the jury, in accordance with previously controlling law and applicable jury instructions, that the defendant had the burden of proof on the issue of self-defense. The instruction was propounded mere days after the Supreme Court unequivocally decided, in *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), that the prosecution is constitutionally required to negate self-defense beyond a reasonable doubt.

In contrast, it was readily apparent at the trial in this case that the court's instruction deviated from the pattern instruction; the offending sentence was removed from the pattern instruction in 1999—several years prior to the trial in 2006. We perceive no basis to disturb appellant's conviction on the basis of the trial court's instruction on reasonable doubt.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**